UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**Ashley Adams,**

           Plaintiff,

                                     **DEMAND FOR JURY TRIAL**

vs.                                        Case No. 22-cv-
                                            Hon.
                                            Mag.

**Nuco Health LLC** d/b/a **HealthRise,**
a Michigan limited liability corporation,
**HealthRise Business Intelligence LLC**
d/b/a **Qodex,** a Michigan limited
liability corporation, **David Farbman,**
**Ryan McKindles**, and **Peter Joseph,**

           Defendants.
_____

**GASIOREK, MORGAN, GRECO,**
**McCAULEY & KOTZIAN, P.C.**
Raymond J. Carey (P33266)
Attorneys for Plaintiff
30500 Northwestern Highway, Suite 425
Farmington Hills, MI 48334
(T) 248-865-0001
(F) 248-865-0002
Rcarey@work-lawyers.com
_____

## COMPLAINT AND JURY DEMAND

       Plaintiff Ashley Adams ("Plaintiff" or "Ms. ADAMS"), by her attorneys,

GASIOREK, MORGAN, GRECO, McCAULEY & KOTZIAN P.C., for her

Complaint against Defendants, **Nuco Health LLC d/b/a HealthRise** ("HealthRise")

and **HealthRise Business Intelligence LLC d/b/a Qodex** ("Qodex") ("collectively

"the Company"), **David Farbman, Ryan McKindles**, and **Peter Joseph** (all Defendants collectively "Defendants"), states as follows:

1.      This is an action by Plaintiff Ashley Adams against Defendants for discrimination against her and interference with her protected rights because of her race in violation of 42 U.S.C. §1981 with respect to her salary and benefits, demotion, and the concomitant "constructive" termination of her employment; discrimination against her and interference with her protected rights because of her race, sex, and pregnancy in violation of Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), M.C.L.A. §§37.2201, *et seq.*, with respect to her salary and benefits, demotion, and the concomitant "constructive" termination of her employment; discrimination against her and interference with her protected rights in violation of the Family and Medical Leave Act, 29 U.S.C. §§2601, *et seq.*, with respect to her salary and benefits, demotion, and the concomitant "constructive" termination of her employment; unequal pay in violation of the Equal Pay Act of 1963, 29 U.S.C. §§ 201, et seq., *see* 29 U.S.C. § 206(d)(1); and tortious interference with Ms. Adams's employment contract and advantageous business relationships with the Company in violation of Michigan common law with respect to her salary and benefits, demotion, and the concomitant "constructive" termination of her employment. Plaintiff's claims arise out of the circumstances leading up to and

including the constructive discharge of Plaintiff from her former Zeta employment, effective May 13, 2022.

## **PARTIES**

2.      Ms. Adam is an individual who resided in the County of Oakland, Michigan, at all times relevant to the allegations in her Complaint and formerly was employed by the Company in Southfield, County of Oakland, State of Michigan, within this judicial district.

3.      HeathRise is a Michigan limited liability corporation that is registered to do and does business in Michigan with its offices and principal place of business located in Southfield, Michigan, within this judicial district.

4.      Qodex is a Michigan limited liability corporation that is registered to do and does business in Michigan with its offices and principal place of business located in Southfield, Michigan, within this judicial district.

5.      Mr. David Farbman is the chief executive officer, principal owner or member of, and major investor in HealthRise and Qodex and resides within this judicial district.

6.      Mr. Ryan Mckindles is the President of HealthRise and resides within this judicial district.

7.      Mr. Peter Joseph is the current President of Qodex and resides within this judicial district.

## **JURISDICTION AND VENUE**

8.     The amount in controversy exceeds $75,000 exclusive of interest and costs.

9.     This Court has subject matter jurisdiction over Plaintiff's claims under and pursuant to 28 USC § 1331 (federal question jurisdiction), 28 U.S.C. § 1343 (civil rights), 29 USC §216(b) (equal pay), and 29 U.S.C. §§2601, *et seq*. (FMLA).

10.     This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over Plaintiff's Michigan state law claims.

11.     This Court has personal jurisdiction over HealthRise and Qodex because they maintain offices, engage in regular and systematic business and other activities, and their resident agent is located within the Eastern District of Michigan and the acts attributed to these Defendants that give rise to Plaintiff's claims occurred and adversely affected her within the Eastern District of Michigan.

12.      This Court has personal jurisdiction over Defendants, David Farbman, Ryan McKindles, and Peter Joseph, because they reside in, maintain offices, and engage in regular and systematic business and other activities within the Eastern District of Michigan and the acts attributed to these Defendants that give rise to Plaintiff's claims occurred and adversely affected her within the Eastern District of Michigan.

13.    This Court has personal jurisdiction over each Defendant because Plaintiff performed the duties and responsibilities of her various HealthRise and Qodex positions on their behalf at all times relevant from her office in Southfield, Michigan.

14.    Venue is proper in this district court pursuant 28 U.S.C. §1391(b) and (c) because Plaintiff resided within the Eastern District of Michigan at all times relevant to her claims; each Defendant maintains offices, engages in regular and systematic business and other activities within the Eastern District of Michigan; and the events that give rise to Plaintiff's claims occurred or had consequences on Plaintiff within the Eastern District of Michigan.

15.    Venue also is convenient in this judicial district.

## Ms. Adams's Claims

16.    Ms. Adams is Black, female, and the former President of Qodex.

17.    Ms. Adams was compelled to resign from her employment with HealthRise and Qodex on May 13, 2022, because she could not tolerate the adverse, interfering and discriminatory actions taken against her, which occurred because of her race, sex, pregnancy, and need for maternity leave; commenced after she gave notice of her pregnancy in September, 2021; and culminated when she returned from maternity leave on Monday, May 9, 2022.

18.    The adverse, interfering and discriminatory actions which were intolerable to Ms. Adams and compelled her to resign on May 13, 2022, included a demotion of her without cause and replacement of her with Mr. Peter Joseph, a Caucasian male who had been a HealthRise vice president, after she commenced maternity leave; concomitant diminution of her authority, duties, and responsibilities; and relegation of her to an undefined Qodex Director of Service Delivery role upon her return from maternity leave.

## COMMON FACTUAL ALLEGATIONS

### A. The Parties

19.    HealthRise and Qodex are two of four companies that comprise what are now known as the Rise Family of Companies with offices in Southfield, Michigan.

20.    The Rise Family of Companies provide services to the healthcare sector, including: information technology services for electronic health records implementation, worker performance management, outsourced billing and revenue cycle management solutions, and staffing of revenue cycle management workers.

21.    The chief executive officer, principal owner or member of, and major investor in each of the companies is Mr. David Farbman.

22.    HealthRise is a revenue cycle management consulting company. It provides expertise to help health care organizations that enable them to maximize

operational improvements, including service delivery, processes, technology, and results, and to identify, prioritize, and eliminate obstacles to revenue maximization.

23.     Qodex was organized in July, 2019. It uses artificial intelligence and digital solutions to increase health care revenue and health care employees' productivity, efficiency, effectiveness, and engagement.

24.     Ms. Adams is a Ms. Adams is Black, female, and a highly educated and experienced Black, female public health professional.

25.     Ms. Adams commenced employment with HealthRise in March, 2016, as one of its directors after receiving a Master Degree in Public Health from the University of Michigan. She remained employed in this capacity until December, 2019, when she was promoted to a senior manager position.

 **B. Ms. Adams's More than Effective Performance of Her HealthRise and Qodex Duties and Responsibilities**

26.     In early 2019, Ms. Adams helped develop software later marketed by Qodex.

27.     Ms. Adams success in this regard prompted discussions between Ms. Adams and Mr. Farbman that led to the formation of Qodex in July, 2019; her initial promotion to a HealthRise Senior Manager position with increased annual salary and bonus, equity awards in HealthRise and later Qodex, and eligibility for annual incentive bonus compensation; an offer from Mr. Farbman to Ms. Adams that she serve as the President of Qodex after it became operational in consideration for

increased annual salary and bonus, equity in HealthRise and Qodex, and eligibility for annual incentive bonus compensation; and an assignment of Ms. Adams to Trinity Health in March, 2020, where she served on an interim basis as one of its vice presidents and facilitated the installation of the Qodex software there as Qodex's first client.

28.    Ms. Adams assumed duties and responsibilities as the President of Qodex in December, 2020, after the successful installation of the Qodex software at Trinity Health. This also was the impetus for a $5 million investment in Qodex by Trinity Health in November, 2021, and a $40 million valuation of Qodex as of 2022.

29.    Business development for and procurement of investments in Qodex were among Ms. Adams's many duties and responsibilities as Qodex's President.

30.    In early 2021, she developed a Qodex "investment deck" to attract and for consideration by potential Qodex investors.

31.    Mr. Farbman deemed the deck to be an excellent means to procure third party investment in Qodex.

32.    Ms. Adams employed the investment deck when she successfully procured the $ 5 million investment in Qodex from Trinity Health in November, 2021.

33.    Between May and August, 2021, Ms. Adams traveled to and attended various business development and prospective investor meetings around the country.

34.     New business opportunities for and investments in Qodex were procured because of Ms. Adams efforts.

35.     Ms. Adams more than effectively or satisfactorily performed the duties and responsibilities of her job as Qodex's President throughout her employment in this role.

36.     Ms. Adams received no negative evaluations of her job performance as President of Qodex or criticism of any kind indicating that she ostensibly was not achieving goals and expectations of the position at any time while she was employed in this capacity.

37.     On or about January 22, 2022, Ms. Adams was awarded a $7,500 annual salary increase to $135,000 and a $15,000 bonus. She also was advised that she had earned additional incentive bonus compensation during 2021 although she was not apprised of the amount and it was never provided to her.

38.     In early 2022, Ms. Adams was publicly recognized for creating an amazing workplace culture at Qodex. She also was a finalist for the DBusiness Culture award.

### C. Adverse Employment Action Experienced by Ms. Adams After She Married Her Husband and Later Became Pregnant

39.     In February, 2021, Ms. Adams married her husband.

40.    Mr. Farbman asked Ms. Adams in reaction to her marriage announcement if she was pregnant because, as he expressed, she "got married quickly."

41.    Mr. Farbman also stated to Ms. Adams that pregnant women have "pregnancy brain," meaning they are distracted from and cannot effectively perform the duties and responsibilities of their jobs as a consequence. Ms. Adams was not pregnant at the time

42.    Ms. Adams became pregnant with her first child in May, 2021.

43.    Ms. Adams did not give notice of her pregnancy to Mr. Farbman or other HealthRise leaders or members of her Qodex team until September, 2021, because of the comments that Mr. Farbman had previously communicated to her.

44.    Ms. Adams was excluded from Qodex related business development and investment procurement initiatives after she announced her pregnancy.

45.    Mr. Farbman also made additional comments to Ms. Adams after she announced her pregnancy about "pregnancy brain," "wives' forgetfulness due to pregnancy brain," "mothers' attachments to children that make them no longer willing to come to work," and that he did not anticipate that Ms. Adams would return to work after she delivered her child.

46.    On September 24th, 2021, Mr. Ryan McKindles, President of HealthRise, announced during a HealthRise all team meeting in reaction to Ms.

Adams's announcement of her pregnancy that he had assumed the HealthRise business development responsibilities of Mr. Peter Joseph, a male Caucasian who had been a HealthRise vice president, and Mr. Joseph had been assigned to Qodex ostensibly as a resource who would provide analytics subject matter expertise and consultation.

47.    The assignment of Mr. Joseph to this purported role was effectuated without previous notice to, discussion with, or concurrence of Ms. Adams although she was the President of Qodex.

48.    Mr. Joseph's assignment to Qodex actually occurred in conjunction with a plan concocted by Messrs. Farbman, McKindles, Joseph, and Marcos Bonafede and other HealthRise leaders to have Mr. Joseph replace Ms. Adams and to assume her Qodex duties and responsibilities because of her pregnancy and other protected characteristics once she commenced maternity leave.

49.    After Mr. Joseph's assignment, he interfered with Ms. Adams ability to engage in one-on-one meetings with Messrs. Farbman, McKindles, and other HealthRise leaders like what had routinely occurred before she gave notice of her pregnancy.

50.    Despite the discrimination that Ms. Adams experienced after she announced her pregnancy, she continued to procure Qodex business opportunities

and procured new Qodex clients and initiated service to them in November and December, 2021.

51.     Ms. Adams also developed and began to implement a plan in December, 2021, for management of Qodex operations while she was on maternity leave.

52.     Ms. Adams management plan provided for Mr. Joseph to function in an interim leadership role for Qodex during her maternity leave although unbeknownst to Ms. Adams at the time Messrs. Farbman, McKindles, Joseph, and Bonafede and other HealthRise leaders had selected Mr. Joseph to replace Ms. Adams and to assume her Qodex duties and responsibilities because of her race, sex, pregnancy, and need for maternity leave.

53.     Ms. Adams began her maternity leave on February 7th, 2022, and her child was born on February 8, 2022.

54.     HealthRise had rented an apartment for Ms. Adams as a benefit of her employment where she was residing during her maternity leave.

55.     In late February, 2022, not long after her baby was born, Ms. Adams received various eviction notices because of HealthRise's failure to timely remit monthly rent payments to the landlord. She experienced extreme mental and emotional distress as a consequence.

56.    Ms. Adams learned during a remote meeting with Mr. McKindles on March 1, 2022, that Messrs. Farbman, McKindles, Joseph, and Bonafede had decided on February 10 or 11, 2022, to have Mr. Joseph permanently replace her and to assume her Qodex duties and responsibilities and they had demoted her to an undefined Qodex Director of Service Delivery role ostensibly in conjunction with two other Qodex structural changes that Mr. Joseph purportedly had recommended.

57.    Mr. McKindles conveyed no reasons for this unjustified and discriminatory adverse treatment of Ms. Adams.

58.    The two other structural changes had been recommended and were being effectuated by Ms. Adams before she commenced her maternity leave.

59.    Ms. Adams concluded that she had been demoted because she is a Black woman who had become pregnant and had taken maternity leave based on the circumstances, including, but not limited to, the comments Mr. Farbman had previously made to her about "pregnancy brain" and his other sexist perceptions, the unjustified reasons for these adverse actions, her more than effective job performance and recognition she had received as Qodex's President, the plan she had developed for implementation while she was on maternity leave, and the timing of the decision to demote her, among other factors.

60.    The unjustified demotion of Ms. Adams under the circumstances exacerbated the extreme mental and emotional distress she had been experiencing.

61.     During the period between March 1 and May 9, 2022, Ms. Adams received various telephone calls and text and other messages from Messrs. Joseph and McKindles during which each of them exerted pressure on Ms. Adams to accept her demotion.

62.     Ms. Adams refused to accept her demotion because it was unjustified and it was obvious to her that the decision to demote her was due to her race, sex, pregnancy, and need for maternity leave.

63.     The conduct of Messrs. Joseph and McKindles further exacerbated the extreme mental and emotional distress Ms. Adams had been experiencing.

64.     Ms. Adams returned to work at Qodex from her maternity leave on May 9, 2022.

65.     Ms. Adams was not reinstated to her role as President of Qodex when she returned from maternity leave on May 9, 2022.

66.     Moreover, Ms. Adams was given no substantive duties and responsibilities to perform during the period between May 9 and 12, 2022.

67.     These circumstances further exacerbated the extreme mental and emotional distress, humiliation, and embarrassment that Ms. Adams had been experiencing, were intolerable to her, and compelled her to submit her resignation to Mr. Farbman on May 13, 2022.

68.     Defendants' post hac purported reasons for their demotion of Ms. Adams and other adverse treatment of her are not true and are pre-texts for discrimination against her on account of her race, sex, pregnancy, and need to have taken maternity leave.

### D.  Ms. Adams Received Less Compensation that Messrs. McKindles and Joseph Although They Performed Equal or Less Work Than Her

69.     The work performed by Ms. Adams while she was employed as President of Qodex was at least equal to the work performed by Mr. McKindles as President of HealthRise and by Mr. Joseph as a HealthRise vice-president and later as Qodex's President or Managing Partner, another name used to refer to Ms. Adams's former Qodex position, but she received less annual compensation and other benefits of employment than what they had received because of her race and sex.

70.     Plaintiff's job as President of Qodex required skill, effort, and responsibility at least equal to the jobs of Mr. McKindles as President of HealthRise and by Mr. Joseph as a HealthRise vice-president and later as Qodex's President or Managing Partner, but she received less annual compensation and other benefits of employment than what they had received because of her race and sex.

71.     Plaintiff's job as President of Qodex was performed under working conditions at least similar to those pertaining to the jobs of Mr. McKindles as President of HealthRise and by Mr. Joseph as a HealthRise vice-president and later

as Qodex's President or Managing Partner, but she received less annual compensation and other benefits of employment than what they had received because of her race and sex.

## COUNT I
### *Race Discrimination in Violation of 42 U.S.C. § 1981*
### *against all Defendants*

72.    Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as if reiterated paragraph by paragraph.

73.    At all relevant times, Plaintiff was an employee and each Defendant was her employer covered by and within the meaning of 42 U.S.C. § 1981.

74.    At all material relevant times, Defendants had a duty under 42 U.S.C. § 1981 not to discriminate against Plaintiff because she is a Black woman who had become pregnant and had needed to take maternity leave.

75.    Defendants treated Plaintiff differently and discriminated against her because she is a Black woman who had become pregnant and had needed to take maternity leave.

76.    Defendants treated Plaintiff differently and discriminated against her because she is a Black woman who had become pregnant and had needed to take maternity leave when they demoted her without cause.

77.   Defendants treated Plaintiff differently and discriminated against her because she is a Black woman who had become pregnant and had needed to take maternity leave when they caused the constructive termination of her employment.

78.   Defendants were predisposed to discriminate against Plaintiff because she is a Black woman who had become pregnant and had needed to take maternity leave when they demoted her and caused the constructive termination of her employment.

79.   Defendants treated Plaintiff differently than at least Messrs. McKindles and Joseph and discriminated against her because she is a Black woman when they provided her with less annual compensation and other benefits of employment than what Messrs. McKindles and Joseph had received.

80.   Defendants were predisposed to discriminate against Plaintiff because she is a Black woman when they provided her with less annual compensation and other benefits of employment than what Messrs. McKindles and Joseph had received.

81.   The discriminatory practices at issue were intentional and willful and were committed with malice and with reckless indifference to Plaintiff's rights and sensibilities.

82.   As a direct and proximate result of Defendants' wrongful and discriminatory treatment of Plaintiff, Plaintiff has sustained injuries and damages,

including, but not limited to, loss of past, present and future salary, bonus, incentive compensation, and other earnings and earning capacity; loss of the value of health, retirement, and other benefits; loss of the value of housing and car allowances and travel, car, and other expense reimbursement; loss of the value of her equity in HealthRise and Qodex; mental and emotional distress, anguish, and anxiety, humiliation and embarrassment; loss of the enjoyment of the ordinary pleasures of everyday life; and loss of the ability to pursue gainful employment of choice.

## COUNT II
### *Race Discrimination in Violation of Michigan's Elliott-Larsen Civil Rights Act*
*against all Defendants*

83.    Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as if reiterated paragraph by paragraph.

84.    At all relevant times material times, Plaintiff was an employee and each Defendant was her employer covered by and within the meaning of Michigan's Elliott-Larsen Civil Rights Act("ELCRA"), M.C.L.A. §§ 37.2101, *et seq.*

85.    At all material relevant times, Defendants had a duty under the ELCRA not to discriminate against Plaintiff because she is a Black woman who had become pregnant and had needed to take maternity leave.

86.    Defendants treated Plaintiff differently, discriminated against her, and subjected her to a hostile work environment because she is a Black woman who had become pregnant and had needed to take maternity leave.

87.     Defendants treated Plaintiff differently and discriminated against her because she is a Black woman who had become pregnant and had needed to take maternity leave when they demoted her without cause.

88.     Defendants treated Plaintiff differently and discriminated against her because she is a Black woman who had become pregnant and had needed to take maternity leave when they caused the constructive termination of her employment.

89.     Defendants were predisposed to discriminate against Plaintiff because she is a Black woman who had become pregnant and had needed to take maternity leave when they demoted her and caused the constructive termination of her employment.

90.     Defendants treated Plaintiff differently than at least Messrs. McKindles and Joseph and discriminated against her because she is a Black woman when they provided her with less annual compensation and other benefits of employment than what Messrs. McKindles and Joseph had received.

91.     Defendants were predisposed to discriminate against Plaintiff because she is a Black woman when they provided her with less annual compensation and other benefits of employment than what Messrs. McKindles and Joseph had received.

92.     The discriminatory practices at issue were intentional and willful and were committed with malice and with reckless indifference to Plaintiff's rights and sensibilities.

93.     As a direct and proximate result of Defendants' wrongful and discriminatory treatment of Plaintiff, Plaintiff has sustained injuries and damages, including, but not limited to, loss of past, present and future salary,  bonus, incentive compensation, and other earnings and earning capacity; loss of the value of health, retirement, and other benefits; loss of the value of housing and car allowances and travel, car, and other expense reimbursement; loss of the value of her equity in HealthRise and Qodex; mental and emotional distress, anguish, and anxiety, humiliation and embarrassment; loss of the enjoyment of the ordinary pleasures of everyday life; and loss of the ability to pursue gainful employment of choice.

**COUNT III**
*Sex and Pregnancy Discrimination in Violation of Michigan's Elliott-Larsen*
*Civil Rights Act*
*against all Defendants*

94.     Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as if reiterated paragraph by paragraph.

95.     At all relevant times material times, Plaintiff was an employee and each Defendants was her employer covered by and within the meaning of Michigan's Elliott-Larsen Civil Rights Act("ELCRA"), M.C.L.A. §§ 37.2101, *et seq.*

96.     At all material relevant times, Defendants had a duty under the ELCRA not to discriminate against Plaintiff because she is a Black woman who had become pregnant and had needed to take maternity leave.

97.     Defendants treated Plaintiff differently, discriminated against her, and subjected her to a hostile work environment because she is a Black woman who had become pregnant and had needed to take maternity leave.

98.     Defendants treated Plaintiff differently and discriminated against her because she is a Black woman who had become pregnant and had needed to take maternity leave when they demoted her without cause.

99.     Defendants treated Plaintiff differently and discriminated against her because she is a Black woman who had become pregnant and had needed to take maternity leave when they caused the constructive termination of her employment.

100.    Defendants were predisposed to discriminate against Plaintiff because she is a Black woman who had become pregnant and had needed to take maternity leave when they demoted her and caused the constructive termination of her employment.

101.    Defendants treated Plaintiff differently than at least Messrs. McKindles and Joseph and discriminated against her because she is a Black woman when they provided her with less annual compensation and other benefits of employment than what Messrs. McKindles and Joseph had received.

102.  Defendants were predisposed to discriminate against Plaintiff because she is a Black woman when they provided her with less annual compensation and other benefits of employment than what Messrs. McKindles and Joseph had received.

103.  The discriminatory practices at issue were intentional and willful and were committed with malice and with reckless indifference to Plaintiff's rights and sensibilities.

104. As a direct and proximate result of Defendants' wrongful and discriminatory treatment of Plaintiff, Plaintiff has sustained injuries and damages, including, but not limited to, loss of past, present and future salary,  bonus, incentive compensation, and other earnings and earning capacity; loss of the value of health, retirement, and other benefits; loss of the value of housing and car allowances and travel, car, and other expense reimbursement; loss of the value of her equity in HealthRise and Qodex; mental and emotional distress, anguish, and anxiety, humiliation and embarrassment; loss of the enjoyment of the ordinary pleasures of everyday life; and loss of the ability to pursue gainful employment of choice.

**COUNT IV**
***VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT ("FMLA")***
*against all Defendants*

105.  Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint as if hereinafter reiterated paragraph by paragraph.

106.   At all times relevant, Plaintiff was an employee subject to the protections of the FMLA and HealthRise, Qodex, and each of their representatives was an employer obligated to comply with the FMLA because HealthRise owned and controlled Qodex and it routinely employed 50 or more employees at Plaintiff's work location, Plaintiff had been employed by HealthRise and Qodex for more than 12 months, and Plaintiff had worked more than 1250 hours for HealthRise and Qodex during the 12 month period preceding the date when Defendants had notice of her need for FMLA leave or when any FMLA leave would have commenced.

107.   The FMLA gives employees the right to take up to 12 weeks of continuous or intermittent leave during a 12-month period due to pregnancy and birth of a child.

108.   The FMLA provides that an employee taking FMLA leave has an accompanying right to return to the same or an equivalent position at the conclusion of the leave period due to pregnancy and birth of a child.

109.   At all times relevant, Plaintiff had been an employee entitled to up to 12 weeks of continuous or intermittent FMLA leave because she had become disabled due to pregnancy and had delivered her child and she was unable to satisfactorily perform the functions of her job without continuous or intermittent FMLA leave due to her pregnancy and birth of her child.

110.   Under the FMLA, Defendants had an obligation to advise Plaintiff that she was entitled to up to 12 weeks of continuous or intermittent FMLA leave due to her pregnancy and birth of her child.

111.   Under the FMLA, Defendants had an obligation to provide Plaintiff with up to 12 weeks of continuous or intermittent FMLA leave due to her pregnancy and birth of her child.

112.   Under the FMLA, Defendants were prohibited from interfering with Plaintiff's exercise of FMLA rights, restraining Plaintiff from exercising FMLA rights, and denying Plaintiff's exercise of or attempt to exercise FMLA rights.

113.   Under the FMLA, Defendants were prohibited from discriminating and retaliating against Plaintiff because she exercised or attempted to exercise FMLA rights by demoting her or constructively terminating her employment.

114.   Notwithstanding Defendants' duties under the FMLA as set forth above, Defendants willfully interfered with Plaintiff's exercise of FMLA rights, restrained Plaintiff from exercising FMLA rights, and denied Plaintiff's exercise of or attempt to exercise FMLA rights, discriminated and retaliated against Plaintiff in violation of the FMLA, and otherwise violated the FMLA when they demoted her and constructively terminated her employment because of the FMLA leave she needed to take due to her pregnancy and birth of her child.

115.  As a direct and proximate result of Defendants' wrongful and discriminatory treatment of Plaintiff, Plaintiff has sustained injuries and damages, including, but not limited to, loss of past, present and future salary,  bonus, incentive compensation, and other earnings and earning capacity; loss of the value of health, retirement, and other benefits; loss of the value of housing and car allowances and travel, car, and other expense reimbursement; loss of the value of her equity in HealthRise and Qodex; mental and emotional distress, anguish, and anxiety, humiliation and embarrassment; loss of the enjoyment of the ordinary pleasures of everyday life; and loss of the ability to pursue gainful employment of choice.

## COUNT V
## VIOLATION OF THE EQUAL PAY ACT OF 1963
*against all Defendants*

116.  Plaintiff re-alleges and incorporates by reference each and every paragraph of this Complaint as if hereinafter re-iterated paragraph by paragraph.

117.  At all times relevant, HealthRise and Qodex were each an "employer" of and "employ[ed") Plaintiff as these terms are defined by section 203(d) and (g) of the Fair Labor Standards Act, 29 U.S. C. §§201, *et seq*. *See* 29 U.S.C. §203 (d) and (g).

118.  At all times relevant, HealthRise and Qodex were each an "enterprise" as this term is defined by section 203(r) of the Fair Labor Standards Act, 29 U.S. C. §§201, *et seq*. *See* 29 U.S.C. §203 (r).

119.   At all times relevant, Plaintiff was an "employee" of HealthRise and Qodex as this term is defined by section 203(e) of the Fair Labor Standards Act, 29 U.S.C. §§201, *et seq*. *See* 29 U.S.C. §203 (e).

120.   At all times relevant, Defendants, Farbman, McKindles, and Joseph, were each a "person" as this term is defined by section 203(a) of the Fair Labor Standards Act, 29 U.S.C. §§201, *et seq*. *See* 29 U.S.C. §203 (a).

121.   The Equal Pay Act of 1963 ("EPA), 29 U.S.C. §206(d) is an amendment to the Fair Labor Standards Act and prohibits "employer[s] ... [from] discriminat[ing] … on the basis of sex by paying wages to employees [...] at a rate less than the rate [paid] to employees of the opposite sex [...] for equal work on jobs [requiring] equal skill, effort, and responsibility, and which are performed under similar working conditions[.]"

122.   The work performed by Plaintiff while she was employed as President of Qodex was at least equal to the work performed by Defendant McKindles as President of HealthRise and by Defendant Joseph as a HealthRise vice-president and later as Qodex's President or Managing Partner.

123.   Plaintiff's job as President of Qodex required skill, effort, and responsibility at least equal to the jobs of Defendant McKindles as President of HealthRise and by Defendant Joseph as a HealthRise vice-president and later as Qodex's President or Managing Partner.

124.   Plaintiff's job as President of Qodex was performed under working conditions at least similar to those pertaining to the jobs of Defendant McKindles as President of HealthRise and by Defendant Joseph as a HealthRise vice-president and later as Qodex's President or Managing Partner.

125.   Defendants violated Plaintiff's rights under the EPA by:

    a.   Failing to provide Plaintiff with compensation and benefits at least equal to what Defendants, McKindles and Joseph, received and are continuing to receive;

    b.   Demoting Plaintiff from her former job as President of Qodex; and

    c.   Constructively terminating Plaintiff's employment.

126.   As a direct and proximate result of Defendants' wrongful and discriminatory treatment of Plaintiff, Plaintiff has sustained injuries and damages, including, but not limited to, loss of past, present and future salary, bonus, incentive compensation, and other earnings and earning capacity; loss of the value of health, retirement, and other benefits; loss of the value of housing and car allowances and travel, car, and other expense reimbursement; loss of the value of her equity in HealthRise and Qodex; mental and emotional distress, anguish, and anxiety, humiliation and embarrassment; loss of the enjoyment of the ordinary pleasures of everyday life; and loss of the ability to pursue gainful employment of choice.

## COUNT VI
### *Tortious Interference with Advantageous Business Relationship and Expectancy*
### *against Defendants, Farbman, McKindles, and Joseph*

127.   Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as if reiterated paragraph by paragraph.

128.   Defendants, Farbman, McKindles, and Joseph, were personally aware that Plaintiff had enjoyed a favorable employment relationship with HealthRise and Qodex.

129.   Defendants, Farbman, McKindles, and Joseph, knew that Plaintiff had reason to be confident that her favorable employment relationship with HealthRise and Qodex would continue indefinitely and at least until she chose to voluntarily terminate her HealthRise and Qodex employment.

130. Defendants, Farbman, McKindles, and Joseph, knew that Plaintiff annually had earned substantial annual salary, bonus, incentive compensation, and received health care, retirement, equity, other fringe benefits from HealthRise and Qodex because of her favorable employment relationship with HealthRise and Qodex.

131.   Defendants, Farbman, McKindles, and Joseph, intentionally and tortiously interfered with Plaintiff's advantageous employment and business relationship with HealthRise and Qodex without justification by demoting her, constructively terminating her employment, and compensating her with annual salary, bonus, incentive compensation, equity and other benefits that were less than

what had been received by Defendants, McKindles and Joseph, because of her race, sex, pregnancy, and need for maternity leave

132.    As a direct and proximate result of Defendants' wrongful and discriminatory treatment of Plaintiff, Plaintiff has sustained injuries and damages, including, but not limited to, loss of past, present and future salary, bonus, incentive compensation, and other earnings and earning capacity; loss of the value of health, retirement, and other benefits; loss of the value of housing and car allowances and travel, car, and other expense reimbursement; loss of the value of her equity in HealthRise and Qodex; mental and emotional distress, anguish, and anxiety, humiliation and embarrassment; loss of the enjoyment of the ordinary pleasures of everyday life; and loss of the ability to pursue gainful employment of choice.

## COUNT VII
### *Tortious Interference with An Employment Contract*
### *Defendants, Farbman, McKindles, and Joseph*

133.    Plaintiff realleges and incorporates by reference the allegations set forth in the preceding paragraphs as if reiterated paragraph by paragraph.

134.    Plaintiff was employed by HealthRise and Qodex in accordance with an express or implied employment contract.

135.    Defendants, Farbman, McKindles, and Joseph, were personally aware of and familiar with Plaintiff's employment contract with HealthRise and Qodex and

that Plaintiff had enjoyed a favorable employment relationship with HealthRise and Qodex.

136.    Defendants, Farbman, McKindles, and Joseph, knew that Plaintiff had reason to be confident that her favorable employment relationship with HealthRise and Qodex would continue indefinitely and at least until she chose to voluntarily terminate her HealthRise and Qodex employment.

137. Defendants, Farbman, McKindles, and Joseph, knew that Plaintiff annually had earned substantial annual salary, bonus, incentive compensation, and received health care, retirement, equity, other fringe benefits from HealthRise and Qodex because of her favorable employment relationship with HealthRise and Qodex.

138.    Defendants, Farbman, McKindles, and Joseph, intentionally and tortiously interfered with Plaintiff's employment contract with HealthRise and Qodex without justification by demoting her, constructively terminating her employment, and compensating her with annual salary, bonus, incentive compensation, equity and other benefits that were less than what had been received by Defendants, McKindles and Joseph, because of her race, sex, pregnancy, and need for maternity leave

139.    As a direct and proximate result of Defendants' wrongful and discriminatory treatment of Plaintiff, Plaintiff has sustained injuries and damages,

including, but not limited to, loss of past, present and future salary, bonus, incentive compensation, and other earnings and earning capacity; loss of the value of health, retirement, and other benefits; loss of the value of housing and car allowances and travel, car, and other expense reimbursement; loss of the value of her equity in HealthRise and Qodex; mental and emotional distress, anguish, and anxiety, humiliation and embarrassment; loss of the enjoyment of the ordinary pleasures of everyday life; and loss of the ability to pursue gainful employment of choice.

## RELIEF REQUESTED

WHEREFORE, Plaintiff Ashley Adams respectfully requests that this Honorable Court grant the following remedies:

a.      Declare that the aforementioned practices and actions of Defendants were unlawful;

b.      Declare that the acts and practices outlined above were in violation of the 42 U.S.C. §1981, the ELCRA, the EPA, and Michigan common law;

c.      Enjoin and permanently restrain these practices;

d.      Direct Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated;

e.      Award Plaintiff the value of all lost past, present and future annual salary, bonus, incentive compensation, and other earnings and earning capacity; the value of all lost health, retirement, and other benefits; the value of all lost housing

and car allowances and travel, car, and other expense reimbursement; and the value of equity she had been and should have been granted in HealthRise and Qodex;

    f.    Award Plaintiff liquidated damages for violations of the EPA and FMLA;

    g.  Award Plaintiff compensatory damages for violations of her protected rights and for mental anguish, emotional distress, humiliation and injury to her reputation;

    h.    Award Plaintiff punitive and/or exemplary damages;

    i.    Award Plaintiff's reasonable attorney fees and costs, including expert witness fees; and

    j.    Grant such other legal or equitable relief as this Court deems appropriate.

Respectfully submitted,

**GASIOREK, MORGAN, GRECO, McCAULEY & KOTZIAN P.C.**

BY:   */s/ Raymond J. Carey*
       Raymond J. Carey (P33266)
       Attorneys for Plaintiff
       30500 Northwestern Hwy., Suite 425
       Farmington Hills, MI 48334
       (248) 865-0001
       rcarey@gmgmklaw.com

Dated: November 15, 2022

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff Ashley Adams, by her attorneys, GASIOREK, MORGAN, GRECO,

MCCAULEY & KOTZIAN P.C., demands a trial by Jury.

Respectfully submitted,

**GASIOREK, MORGAN, GRECO,
MCCAULEY & KOTZIAN, P.C.**

BY:  */s/ Raymond J. Carey*
 Raymond J. Carey (P33266)
 Attorney for Plaintiff
 30500 Northwestern Hwy., Suite 425
 Farmington Hills, MI 48334
Date:  November 15, 2022 (248) 865-0001
 rcarey@gmgmklaw.com